# Dundas' Estate.

*Decedents' estates—Evidence—Evidence as to birth of claimant.*

A claim of right not asserted as a legal demand until after the death of the party affected by it, although upon the claimant's own showing it originated and matured many years before, comes before the orphans' court discredited on its face, and with every presumption against it; and this applies with increased force where the claim, repudiated in the lifetime of a decedent, not only involved a large portion of the estate, but, if sustained, blasts the decedent's good name, and convicts of the commission of crime.

A recovery in such a case can only be had upon evidence clear and convincing; the claim must be established by the testimony, free from inconsistency or contradiction, of witnesses whose veracity is unimpeachable; and the circumstances must be such as to be inconsistent with any other explanation, and leave no rational doubt of the justice of the claim. To doubt as to such a claim, must, necessarily, be to deny. This principle applies to a claim to share as a distributee in a decedent's estate, where the claimant asserts that he was the illegitimate son of decedent, although born during the period of the decedent's lawful wedlock, and such claim was repudiated in the lifetime of the decedent.

Argued May 23, 1905. Reargued Jan. 2, 1906. Appeal, No. 41, Jan. T., 1905, by Arthur Fitzroy Somerset Dundas, from decree of O. C. Phila. Co., April T., 1893, No. 188, dismissing petition for review in Estate of Anna Maria Wurts-Dundas, deceased. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Petition for review.

ASHMAN, J., filed the following opinion :

Anna Maria Wurts-Dundas died January 10, 1897, at Nice, France. Her husband, Major William Wurts-Dundas, died in December of the same year. Two children were born of the marriage, William, who died in 1893, and Ralph, who still survives. Mrs. Dundas left a memorandum in the nature of a will, bequeathing all that she possessed to her husband for life. By agreement between the father and the surviving son, this paper was never offered for probate, and the decedent was treated as having died intestate. An account of the administrator of her estate was filed and the balance then in hand was awarded and paid to the son. After the settlement of the account and distribution thereunder, and for the first time, a claim was made against the estate on behalf of an alleged son of the decedent, who is now of full age and has assigned his claim. The details of this claim, which Balzac would probably have rejected as too extravagant to serve as the groundwork for a French novel, are embodied in a mass of testimony, the essential matters of which may be compressed within a comparatively narrow space. With the exception of tours of the continent and occasional visits to the United States, Major Dundas and his wife spent most of their married life at Paris,

where they occupied handsome apartments and mingled in the
social circles of the capital. Among their more intimate
friends was a Captain Farquhar. He came of a noble family,
but his course of life had been the source of great distress to
his family. In and before the year 1880 he was a frequent
visitor at the house of Major and Mrs. Dundas; partook of
their hospitality and was admitted to their confidence. If the
petitioner's narrative may be believed, the captain grossly
abused this friendship. Late in May, 1880, . Major Dundas
left France upon a short trip to this country, and almost im-
mediately after his departure Mrs. Dundas, it is said, wrote
to Henry Petre, a mutual friend of her husband and of Cap-
tain Farquhar, requesting an interview, which he granted.
She then, as further alleged, informed him that she had given
birth to a child about the middle of June; that she had been
attended by an American doctor; and that Captain Farquhar
was the boy's father. She further stated that she had placed
the infant in care of two nurses, Mary Redmond and daughter,
and that these women were Roman Catholics and insisted
upon its baptism. Petre, at her urgent insistance, consented
to act as godfather, and at the time fixed accompanied the
mother to the church, where they were joined by the father,
two nurses and the child. It had been agreed that the par-
ents should take the names respectively of Arthur F. and
Anna Somerset and the child that of Arthur Somerset. The
church record, Petre declared, was signed by himself as god-
father and by the father and mother, although he was unable
to say that he saw them actually write. Thereafter from some
source (Petre said, from the decedent, because Captain Far-
quhar had no money) periodical payments for the care of the
child, were made to Mary Redmond. In 1883, Petre drafted
for the decedent a letter to Messrs. Drummond, bankers, pro-
posing to open an account with them for 1,100 francs which was
to be paid out in monthly installments to the nurse. This
letter was signed Mary Somerset, although the assumed name
of the writer was Anna Somerset. Most of these payments
were made through Petre. They ceased in 1890, and on July
28, of that year, Petre wrote to the bankers requesting them
·to pay over to Mrs. Redmond the balance upon his guaranty
to save them harmless. This he asserted was after the re-

ceipt of a letter by him from the decedent, dated at Paris, in which she declared she could make no further remittances, and desired him to say to the nurse that she was dead. Instead of complying with this request, Petre subsequently directed the lawyer who represented the nurse, to apply to Mrs. Dundas, Place Vendome, Paris, for information as to the mother of the child. The nurse testified that she had applied in various directions, among others to the office of the British Embassy in Paris, for redress for herself and the child. She finally crossed to England and appeared before a magistrate in the Bow Street police court, London. After repeating her story to the judge, she was approached, as she alleged, but which he denied, by a lawyer whose practice lay in the criminal courts, and who proposed to act as counsel for the child. The attorney, acting upon information obtained from her and from Mr. Petre, wrote to Mrs. Dundas. The letter came into the possession of Major Dundas, who learned through the writer, Wallis, the story of the child's parentage. (The lawyer suggested that for a money consideration the child would be adopted by Mrs. Redmond and all danger of a scandal averted.) At this time Mrs. Dundas was so critically ill that a knowledge of the alleged facts would have in all probability proved fatal. Major Dundas was confronted by a fearful emergency. He did not dare to leave his wife in her then enfeebled health, he was powerless to probe the charges, and in August, 1890, he paid £325 to the lawyer, who retained thereout £125 for his services and gave the balance to Mrs. Redmond. In September, 1890, he made a fresh demand upon Major Dundas, in the sum of £150, on the ground that his services in effecting a settlement had been of special value to the major. To this demand Major Dundas returned a peremptory refusal. The women afterwards quarreled over the division of the money, and the child finally came into the custody of the younger nurse.

With this episode all proceedings during the lives of the decedent and her husband ended. Nearly ten years later and after the principals had been removed by death, the claim was presented in its present shape. In a case of this character where the opposing elements are mainly money on one side and family honor on the other, it is almost a trite thing to say

that the proof on the part of the claimant should be of a moral order so high that it should not admit of a well-grounded doubt of its accuracy. Especially is this true where the claimant has deferred his attack until after the death of the party whose wealth he would share and whose character he seeks to defame.

To begin with, the incidents attending the birth and the after-care of the child, as they are narrated by the witnesses for the petitioner, are simply inexplicable. The decedent and her husband occupied the same apartments in Paris, and were well known to and welcomed by the American colony in that city. The husband, in May, 1880, left upon a brief trip to the United States, and a week or two after his departure his wife informed Mr. Petre, as he alleged, that a child had just been born to her, whose father was a stranger, and that the nurse in whose charge it had been placed insisted upon its baptism according to the rites of the Roman Catholic Church, the mother herself being a Protestant. She wound up the announcement by requesting Mr. Petre to act as godfather at the ceremony. The church record of the baptism was produced which bore the alleged signatures of the parents, under the name of Somerset. The first name of the mother had been written on an erasure, and it was claimed to represent " Anna." Two handwriting experts, however, testified that the name was absolutely indistinguishable, and they declared that the rest of the signature was evidently written by the same hand which had signed as Arthur Somerset. What adds to the strangeness of the proceeding, as viewed from the standpoint of the decedent, is the circumstance that the ceremony was solemnized with her consent in a church edifice, which was open at all hours to worshipers and visitors, and in which at any moment she might have been recognized.

But another and apparently impassable bar to the acceptance of the narrative is the personal description of the decedent, which was furnished by the claimant's witnesses. The decedent was quite petite, and the slenderness and grace of her figure were everywhere remarked. Indeed, she prided herself upon these characteristics, and was careful to dress in a manner to show them to advantage. To use the words of Mr. Petre, " She was short, very elegant and very small waisted."

The nurse with whom the child had been left, in the descriptions which she gave of the mother, pictured her as the reverse of this portrait. In her testimony before the commissioner she described the child's mother as a good-sized lady, with "yellow hair" (the decedent's hair being a dark brown), tall, above the average height of a woman. To the lady who founded the Mission Home and Orphanage Institution at Paris she said the mother was an Englishwoman; that "she was big, stout and thick-set, and always came into the room with a bounce." She complained that the parents had discontinued the stipulated allowance for the support of the child, and when she was told by the manager that the sum which was then due would be paid her by the institution provided she would surrender the child to its custody, she replied that she would do better than that, and that she would bring up the boy to be a curse to his parents.

If the testimony of Mr. Petre were excluded, a court might well hesitate, upon the remaining evidence, to sustain a verdict in favor of the claim. He alone of all the witnesses has brought the decedent face to face with the claimant; he was the confidant to whom the decedent made an unreserved confession of her double folly and crime, and at the same time implored his aid, and he was an eyewitness and actor at the child's baptism. Unfortunately for the purposes of this investigation, the supreme test of his truthfulness or falsehood—the letters of the decedent, whose production would have ended the case—are wanting. The vital fact that such letters were ever received, or that, if received, they came from no other than the decedent, rests on his unsupported word. His testimony as to the decedent's presence at the christening stands on no better basis. It is not corroborated by the record which he declared she signed, in which the assumed first name of the child's mother was undecipherable, and in which her assumed family name was apparently in the handwriting of Arthur Somerset. Our business is with facts, and we are not bound to search into motives. One or two things, however, appear upon the surface. Mr. Petre was a man of the world, cynical and indifferent in his mode of thought, but solicitous, it may fairly be presumed, for the reputation of certain noble English families with which he was more or less closely allied. The ties between him and

the decedent were purely conventional, and had indeed been severed when by his own admission, the decedent had deliberately cut him in public. He knew before he gave his testimony, that she and her husband were dead. It is at least possible that he determined to interpose the decedent who had thus passed out of his life, as a shield to protect the honor of an English lady, who is more or less obscurely hinted at in the evidence as figuring in the history of Captain Farquhar. The captain's brother, for instance, stated that he had examined the contents of a box containing letters addressed to his brother, which after the death of the latter had been sent the witness by Mr. Petre, and that no letter from Mrs. Dundas was among them, but letters were there from an English lady of title which showed that the writer was on terms of close friendship with the captain. If this was Petre's design, his task was comparatively easy. He had only to substitute the name of this decedent for the actual person who assumed the name of Somerset, and the whole superstructure of his story was already built. A woman under that name undoubtedly placed a child in the home of the Redmonds, and attended at its baptism ; either she or Captain Farquhar furnished the moneys for its maintenance, and she wrote, if they were written at all, the self-incriminating letters. If the testimony of a number of eyewitnesses is to be believed, this person differed in essential particulars, which could not have been mistaken or overlooked, from the decedent. Captain Farquhar, who could have solved the riddle, is dead, and Petre alone swears to the identity of the decedent. We have read the evidence with care, and are bound to say that, in our judgment, it does not sustain him.

It would serve no useful end to attempt an elaborate analysis of testimony which covers 1,000 pages of print, and which contains much that is necessarily irrelevant in connection with the acts of parties which took place many years ago. Discrepancies and contradictions are apparent in the proofs submitted on both sides of the controversy, and are the natural consequence of a lapse of memory on the part of the narrators ; but they have little bearing on the final result. The same may be said of other incidents which, standing by themselves, would seem difficult of explanation. It may be freely admitted, for instance, that Mrs. Dundas was flattered by the attentions of

Captain Farquhar, and that she even loaned him some of her jewels upon which to borrow money for his needs.   It was not, however, so remarkable as to be incredible; the captain was a trusted friend of her husband and she knew him to be in financial straits.   So the payment by Major Dundas, under the settlement forced upon him by the claimant's attorney, loses whatever sinister meaning might otherwise have attached to it, in view of the absolute inability of the husband to probe at the time into the facts.   That he soon after learned enough to assure him of his wife's innocence, is very manifest from his reply to the lawyer's demand for additional money.   His language in that letter was : " Had I possessed a month ago the data now in my hands and for the collection of which some time was necessary, I would not have paid one penny.   If the parties apply to me in France I am determined to make it a matter of summary police correctionelle."   The nurse, embittered because she felt that she had been defrauded by the child's parents, was a willing witness for the claimant.   She made variant statements as to the number of visits made by the mother to the witness' house, and she recognized a photograph likeness of the decedent, although she said the mother wore a veil at those visits and at the child's baptism.   She admitted that she had never heard the name Dundas until it was communicated to her by the lawyer Wallis.   Mr. Petre's declaration that the money for the child's support must have come from the decedent for the reason that Farquhar was destitute, was offset by his after declaration that he received a letter from the captain, who was in his command in Egypt, stating that the writer had a deposit of £600 in the bank at Cairo, which was subject to Petre's order.   It is unnecessary, however, to go into further detail.

The petition is dismissed.


Concurring opinion by PENROSE, J.

The petition in this case seeks to set aside a decree confirming the adjudication of the account of the administrator, making distribution of the decedent's estate between her husband and son—such distribution having been confirmed more than a year after her death, and the husband having died before the presentation of the petition (see Piper's Estate, 208 Pa. 636).

It alleges that the son to whom distribution was made was not the only child of the decedent, and that the petitioner was also her child, born in June, 1880, and as such entitled under the intestate laws to one-third of her estate. This averment of the petition is denied by the answer, in the most positive terms.

The claim of the petitioner, it is now stated, has been assigned, and any recovery will inure to the benefit of the assignee. The consideration of the assignment does not appear, but the amount covered by the petitioner's claim is one-third of the estate embraced in the administrator's account, or $38,173.39, with interest.

The petitioner, who was examined as a witness on his own behalf, admitted on cross-examination that he had, before making the assignment, endeavored to raise money on his claim by fabricating evidence in its support, and the case is thus brought within the principle, illustrated by McHugh v. McHugh, 186 Pa. 197; Moriarty v. Railway Company, L. R. 5 Q. B. Cases, 314, etc., that the fabrication of evidence, while it does not raise a presumption of law, justifies a finding against the guilty party, as furnishing "strong evidence that he knew perfectly well that his cause was an unjust one."

It is not necessary, however, to decide the case on this ground, though in considering the testimony of the petitioner's witnesses it is not to be lost sight of.

In 1880, and for a number of years before and after that time, the decedent and her husband resided in Paris. They had two children, of whom the youngest was then about seven years of age. In May, or the latter part of April, of the year mentioned, the husband was called to Philadelphia where he remained until some time in the following fall, leaving, in the meantime, his wife, the decedent, in charge of their house and household and of their little son.

The petitioner alleges that the wife, at the time of the husband's departure, was far advanced in pregnancy and on the eve of confinement, as the result of an intimacy with an officer of the British army; and that taking advantage of the opportunity afforded by the husband's visit to America, she absented herself from their residence and went to a house in another part of Paris, where, for a period of six weeks she remained

with this officer, as husband and wife, and where, during that time, viz.: June 18, 1880, she gave birth to an illegitimate child, whom, after supporting for a number of years, she finally deserted; the child so born being the present petitioner.

The husband, as already stated, returned to his wife and family in the fall of 1880, and from that time the marital relation continued without interruption until the wife's death, in January, 1897. What became of their little son during the six weeks that the wife is thus alleged to have abandoned him, is not stated or explained.

The testimony in the case shows, without contradiction, that the husband and wife lived together, not only in the same house but in the same apartment; and why, therefore, there should have been any reason for concealing from the husband (assuming that it was possible to have kept him in ignorance of the wife's pregnancy) and from the world the birth of a child, it is difficult to imagine. Pater est quem nuptiæ demonstrant; and the presumption that the husband, under the circumstances of this case, who was not simply infra quatuor maria but infra quatuor mœnia, was the father of any child who might be born by the wife, was a conclusive one—so conclusive, indeed, that even the sworn testimony of the wife would have been insufficient to overcome it: Dennison v. Page, 29 Pa. 420.

Conceding, however, the possibility of a motive for concealment, and the fact that the husband, who was the undoubted father of her two acknowledged children, was not, and must have known that he was not, the father of a child to which she might give birth in June, 1880, the course alleged to have been taken to effect concealment was still more extraordinary than even the desire to conceal at all.

The decedent was an American woman, of prominent social position, and, as it would seem, well known as such to the Parisian public, generally, and especially to other Americans residing in that city; yet, as alleged by the petitioner, one of the first steps taken, in the plan to conceal her disgrace, was to call in, during the period of her confinement and while she was living as the wife of an officer in the British army, an American physician. It need scarcely be added that this physician was one who has since died.

The next of these extraordinary steps was the public baptism of this illegitimate child in a Catholic church—neither of the adulterous parents being Catholic, but both of them appearing at the ceremony and avowing their relationship.

But still more extraordinary is the assertion that in order to procure the services, as godfather, of an intimate friend of the father, the mother unbosomed to him—he being a Catholic, and told him, what was wholly unnecessary that he should know, of the birth of the child, its paternity, the employment of the American doctor, etc. This gentleman, who appears to be the deus ex machina of the petitioner's drama, declares that he was greatly astonished at the announcement as he had not the least suspicion of such a condition of affairs, though he had seen his informant only a short time before they happened; and he gives as a reason for this remarkable confidence that the two Irishwomen, mother and daughter, who had agreed, in consideration of the payment of a large monthly sum, to take care of the child, were devout Catholics, and might give up their bargain unless there should be a baptism thus solemnized. Of these two women, it may be added, the daughter, who is still living, admits that at a subsequent period, she was sent to prison upon a charge by the mother that she was appropriating to her own use the money thus paid—the charge, as the daughter vehemently asserts, having been false and the mother a perjurer.

The gentleman who thus became godfather goes on to state that the decedent afterwards deposited with certain English bankers funds for the support of the child—the deposit having been effected through the agency of a letter, signed by her, which he prepared for the purpose. A very remarkable feature of this letter, which was produced, is the fact that the depositor, forgetting that her name, as well as her assumed name, was "Anna," describes herself in the letter, and so signs it, as "Mary"; while the handwriting of the signature not only bears no resemblance, discoverable to the ordinary eye, to that of the decedent, but is declared by some of the experts who were examined to be identical with that of the body of the instrument, which was written by the godfather, himself.

At a still later date, when, as he says, the mother's love for the child, which had been intense, had so completely ended

that she no longer made remittances for its support, the god-father's influence with the bankers—who had never seen the depositor—was such that he was permitted to draw the balance standing to the credit of "Mary Somerset," without communication with her, and send it to the Irish caretakers. About the same time, he also testifies, the mother positively refused to do anything further for the child's support, and declared that application must be made to the relatives of the father, which, of course, necessarily involved the making public of the facts which she had, according to the witness, been always, theretofore, so solicitous to conceal.

With regard to the testimony of this witness, so far as it is based upon admissions alleged to have been made to him by the decedent, what was said by Judge COULTER, in Harbold's Executors v. Kuntz, 16 Pa. 210, may well be applied: "Admissions—the easiest mode of testimony to lead to error, the kind of evidence most apt to be misapprehended and mistaken, and in relation to which a facile conscience may stretch itself like India rubber." That his conscience was "facile" is demonstrated by his own letters, in one of which, apparently in answer to an effort to induce him as godfather to do something for the support of the child, he says, "Any part that I have had in this business began and ended in the religious ceremony of baptism;" and in another he asserted that he "acted as godfather at the earnest request of the father," and not, as he now states, at the instance of the mother, to aid her in the trouble which she confided to him.

He speaks of letters received by him from the decedent in connection with these transactions, but explains his inability to produce any of them by the assertion that after the death, in 1883, of his friend, the British officer, he gave them all to the friend's brother; but the brother, who was examined as a witness on behalf of the petitioner, denies this, and declares that no letters from her ever came to his possession. He admits, however, that there were letters from an English lady, of high social position, between whom and his brother, according to "gossip," the "relationship" was "very close," up to the time of his going to Egypt, where he was killed; and it is within the range of possibility that a desire to screen this lady at the expense of a foreigner, in whom he had no interest, may

have furnished a motive to the godfather, who was an English-man, also of "high social position."

In 1890, when there was a likelihood of the petitioner's becoming a charge on the public, the godfather referred inquirers to the decedent. She was then very ill, and communications addressed to her came to her husband. These communications were from a Bow Street lawyer on behalf of the Irish caretakers, and the husband, shocked by what was thus brought to his knowledge, and unable to communicate with his wife as to the real facts, was induced to pay a considerable sum of money to suppress a story which, as he then thought, covered himself and his family with disgrace; but soon afterwards, when further demands were made on him, when, it is fair to believe, the wife had sufficiently recovered to make him acquainted with the real facts, he declared, in a letter addressed to this lawyer, "As to the persons who now, taking exception to the settlement concluded with you, suggest an appeal to me, I will say that had I possessed a month ago the data now in my hands and for the collection of which some time was necessary, I would not have paid them one penny. If they apply to me in France I am determined to make it a matter of summary police correctionelle." This defiance to a lawyer, having in his possession all the information now presented to the court, was in September, 1890; and there the matter rested, without any action, whatever, until May, 1899, when the present petition was presented, more than two years after the death of the decedent and nearly two years after the death of her husband.

It has often been said that a claim of right not asserted as a legal demand until after the death of the party affected by it, although upon the claimant's own showing it originated and matured many years before, comes before the court—and especially the court established for the protection of those no longer able to protect themselves, discredited on its face, and with every presumption against it; and this applies with increased force where the claim, repudiated in the lifetime of a decedent, not only involves a large portion of the estate, but, if sustained, blasts the decedent's good name, and convicts of the commission of a heinous, most disgraceful crime. A recovery in such a case can only be had upon evidence clear and convincing; the claim must be established by the testimony,

free from inconsistency or contradiction, of witnesses whose veracity is unimpeachable; and the circumstances must be such as to be inconsistent with any other explanation and leave no rational doubt of the justice of the claim. To doubt as to such a claim, must, necessarily, be to deny.

It is enough to say that the testimony in support of the claim in the present case is not of this character, and that, apart from inherent, manifest improbabilities, the witnesses contradict themselves and each other; this being especially noticeable in the case of the leading witnesses relied on to establish the claim. The daughter of the Irishwoman declares that the father and mother of the child came almost daily, in the years 1880, 1881, 1882 and 1883; and William Kelly (Father Matthew), who was introduced to the mother and actually saw her "nursing the baby," in 1880, tells how freely and openly she talked to him in 1883, when she and the father were about to start "on a voyage around the world"; yet the godfather speaks of her dread of discovery, and of his going with her three times during the years mentioned, because she was "afraid to go." A janitor, Royer, who says he saw the mother several times in 1882 or 1883, and, seventeen years afterwards, is able to identify her by a photograph, is contradicted by his own written statement. Another janitor, Rivey, janitor of the building in which the child was born, who at times saw the mother in 1880, during the month in which she was confined, is able to identify her after the lapse of twenty years. He declares that the two Irishwomen, mother and daughter, came there for the child—the mother going upstairs and carrying the baby in her arms, leaving in a cab, while the parents remained until three or four in the afternoon; but the daughter swears that the child was brought to them, in their apartment, by the father, who gave it to her, and that the father and mother "always said it was born in England." The daughter also swears that the Bow Street lawyer asked her to employ him, which he denies and declares to be untrue. He admits, however, that he deceived his clients; that he acted for both parties; and finally, after having undertaken, in the most solemn manner, not to act further in the matter, that he broke his engagement and, after the death of the decedent and her husband, renewed his connection with the petitioner. He also

swears that the godfather, Mr. Petre, told him who the mother was, while the latter swears that he did not. Mr. Petre gives a dramatic account of a trouble which occurred at the baptism because of the unwillingness of the priest to permit the mother to sign for the absent godmother, because that would be "illegal," but the priest himself, Father Cassabianca, tells us, that such signing would be entirely proper—the same thing being also said by Father Matthew. Madame Theophile Vielletet swore, that she saw the baptismal party—the nurse and child, godmother and godfather, and a lady and gentleman, "said to be the father and mother;" but on finding that she had fixed the time three years too late, she said, quite unconcernedly, " I did not affirm that it was the baptism of the little one. Miss Redmond did not tell me. People said it in the neighborhood. Perhaps it was the baptism of another child in the house." The testimony of Miss Redmond is so saturated with contradiction and prevarication that the mere reading of it is sufficient to show its utter unreliability.

In cases of this character, discrepancies, even as to seemingly trifling matters, have always been regarded as significant. A notable illustration is reported in a book of very high authority (Apocrypha, Hist. Susanna, chap. 1).

When opposed to all this is the testimony of the numerous witnesses on behalf of the respondents, which, if believed, and there seems to be no reason to doubt it, proves that the decedent could not possibly have been the mother of this child, we can have no hesitation in declaring that the petition to vacate the decree confirming the adjudication and permit the petitioner or his assignee to participate in the distribution of the decedent's estate, must be dismissed.

*Error assigned* was the decree of the court.

*Gustavus Remak, Jr.*, of *Remak & Eichholtz*, and *Alex. Simpson, Jr.*, for appellant.

*John G. Johnson*, for appellees.

PER CURIAM, February 5, 1906:
The decree is affirmed on the opinions of the court below.